United States District Court
Northern District of California

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| USA,<br><br>    Plaintiff,<br><br>v.<br><br>DARRELL MURPHY and DESHAWN LEMONS-WOODARD,<br><br>    Defendants. | Case No. 19-cr-00043-YGR  (DMR)<br><br>**ORDER RE FORFEITURE OF BONDS OF DEFENDANTS DARRELL MURPHY AND DESHAWN LEMONS-WOODARD**<br>Re: Dkt. Nos. 162, 171, 177, 181, 182, 183, 184 |

Defendants Darrell Murphy and Shawn Lemons-Woodard are charged in a multi-defendant indictment with conspiracy and dealing firearms without a license. [Docket No. 131 (Superceding Indictment)]. On February 25, 2019, following a detention hearing, the court released Murphy on a set of conditions which included a $50,000 unsecured bond co-signed by his grandmother, Lakysha Fields. [Docket No. 34]. The court held Lemons-Woodard's detention hearing on April 10, 2019 and released him on a $75,000 bond co-signed by his aunt Deshawna Sterling Patton as well as his mother, Nichelle Lemons. [Docket No. 79]. On October 18, 2019, the government moved to remand Murphy and Lemons-Woodard and to forfeit their bonds due to violations of the conditions of their release. [Docket No. 162]. Both Defendants filed opposition briefs. [Docket Nos. 171, 177]. On October 30 and November 4, 2019, the court held hearings and remanded Murphy and Lemons-Woodard, respectively. The parties submitted supplemental briefing on the issue of bond forfeiture at the court's instruction. [Docket Nos. 181, 182, 183, 184]. Having considered the parties' arguments, the court orders that the $50,000 bond be forfeit against Murphy and co-signor Lakysha Fields, and that the $75,000 bond be forfeit against Lemons-

Woodard and co-signor Nichelle Lemons.[1]

## I. BACKGROUND

### A. <u>Darrell Murphy</u>

Murphy is 21 years old. On February 25, 2019, following a contested detention hearing, the court largely adopted the recommendation of Pretrial Services and released Murphy on a $50,000 unsecured bond co-signed by his grandmother, Lakysha Fields, who also agreed to house him and serve as his custodian. Release Order [Docket No. 34]. The release order set forth numerous strict conditions. Of particular relevance here, it included the conditions that Murphy not commit any federal, state or local crime, that he not have contact with any of his co-Defendants outside the presence of counsel, and that he maintain verifiable employment, or if unemployed, seek employment or commence an educational program as directed by Pretrial Services. *Id.* Murphy was placed on electronic monitoring and was permitted to leave his grandmother's home only for specified purposes such as court appearances, drug treatment and testing, work, and school. *Id.*

The court interviewed Fields in court and determined that she is a law-abiding person who has a close relationship with her grandson. She expressed her willingness to provide critical moral suasion to deter Murphy from violating the conditions of his release. The court accepted Fields as a co-signor on an unsecured bond, rather than a surety who must demonstrate adequate assets under Federal Rule of Criminal Procedure 46(e) and agree to forfeiture of certain sums pursuant to 18 U.S.C. § 3142(c)(B)(xii). Thus, the court imposed the co-signor condition under section 3142(c)(xiv)'s catch-all provision. *See United States v. Thomas*, 615 F. Supp. 2d 1083, 1085-86 (N.D. Cal. April 29, 2009) (noting that this procedure is employed routinely throughout the federal

---

[1] The government's motions for remand and bond forfeiture were filed directly before this court rather than being referred by the district court. The district court referred a similar motion regarding a co-Defendant to a different magistrate judge pursuant to Federal Rule of Criminal Procedure 59(a) which governs referrals of non-dispositive matters. *See* Docket No. 188 ("Order Referring Motion to Magistrate Judge Westmore."). The magistrate judge then issued a report and recommendation. *See* Docket No. 202 ("Order Denying Motion to Remand Defendant Kennedy-Palmer; Report and Recommendation to Deny Motion to Forfeit Bond."). This court will treat the matter as a Rule 59(a) referral. For that reason, this order is not styled as a report and recommendation, because that is the required procedure for Rule 59(b) referrals but not for those made pursuant to Rule 59(a).

2

courts). The court addressed Fields directly to make sure that her agreement to co-sign the bond and to act as custodian was voluntary, to explain that the government could seek to obtain a $50,000 judgment against her if Murphy violated a condition of his release, and to answer any of her questions about being a co-signor or a custodian. Fields agreed to sign the bond with full knowledge of the potentially dire financial consequences that could ensue if Murphy violated his release order.

For several months Murphy appeared to be adjusting well to pretrial supervision. On March 14, 2019, the court signed the parties' stipulation permitting Murphy to leave Field's house to attend a baby shower for his expected child. [Docket No. 54]. On April 3, 2019, the court approved another stipulation allowing Murphy to stay overnight at the hospital to be present for the birth of his child. [Docket No. 73].

Unfortunately, on August 9, 2019, Murphy's seemingly compliant behavior came into question when Pretrial Services provided notice of two bail violations. The first violation involved Murphy's deceptive behavior regarding employment. Murphy advised Pretrial Services that he had gotten a job, and that he would be working night shifts. He was granted permission to leave his grandmother's house from 9:00 p.m. to 7:30 a.m. to attend his first shift. The employer subsequently notified Pretrial Services that Murphy had clocked into work but then immediately walked off the job. Murphy's actions had been captured on the employer's video camera. When confronted with this information by his Pretrial Services officer, Murphy denied that he had abandoned his job. Instead, he concocted an elaborate story about how he was not able to clock out that night due to an equipment failure. He claimed that a supervisor named Melissa (later confirmed to be non-existent) could vouch for him.

The second violation involved Murphy's enrollment in a local community college. Several months into the semester, Murphy's Pretrial Service officer made an unannounced school visit. Finding the school nearly empty, the officer learned that the school term had ended the week prior, even though Murphy continued to notify him about his alleged class hours in order to obtain permission to be away from his grandmother's home during those periods. When the officer confronted Murphy, he denied that his classes were over and claimed that he had been in a

3

computer lab. The officer went back to check the posted hours for the computer lab and discovered that it had been closed during the time that Murphy reported that he was there.

The officer continued to investigate both violations for several days and Murphy continued to deny the violating conduct. After confirming both violations through investigation, the officer drafted a bail violation memorandum and provided a copy to Murphy's attorney. Approximately one hour later, Murphy acknowledged to his officer via email that he had lied about not leaving work. In fact, he clocked in, then immediately left his workplace to get food before going to stay at a friend's house overnight. As to the school-related violation, Murphy continued to contend that he had visited the computer lab for a few hours, but then explained that he spent the rest of the day "roaming around."

At the request of Pretrial Services, the court held a hearing on August 15, 2019 so that Murphy could show cause why his bond should not be revoked. At the hearing, Murphy made an impassioned plea for leniency. He stated "[I want] to take responsibility for my actions. I've been trying to better myself." Transcript of 8/15/19 hearing at 15 [Docket No. 161]. He claimed that he understood that he would not be able to take care of his newborn son and his fiancée if he was in jail. *Id.* Murphy asserted that the situation "made me realize that if I was to continue to mess up, I would be away from my family for a long time and that is something that I do not want to happen. I was without a dad for my whole life and I know how much it mean[s] for someone to have a dad in their life." *Id.* at 15-16. During the hearing, the Pretrial Services officer informed the court that Murphy still had not provided documentation that he had completed the three classes that he allegedly had been attending all semester. Instead, Murphy had provided "a blurry screenshot" of his grades. The court asked: "Mr. Murphy, did you attend all three classes? Did you get grades in all three classes?" Murphy responded "Yes, I did, Your Honor," before launching into a detailed explanation of why he had not yet been able to provide verification to the officer. The court asked Murphy again:

> THE COURT: Mr. Murphy, I want you to answer this very carefully. And you might want to talk to your lawyer first, okay? And I'm asking you here in a court of law, so this is not the time to double-down on lies. If you did not finish those

4

United States District Court
Northern District of California

> classes, you know, attend classes sufficiently to get a grade in each of them, you need to say so now…
>
> MURPHY: Yes, Your Honor. Yes. I did attend.
>
> THE COURT: Okay. Well – and you got grades in each of them?
>
> MURPHY: Yes, I did get grades, but I recently have a hold on my – on my account to where I can't access any type of information. But before they put the hold on there and I was recently – before the semester was over, I was able to [take a] screenshot.

Murphy then promised to provide verification that he completed his classes. *Id.* at 22. The court began considering the possibility of allowing Murphy to remain out of custody, but on strict "lockdown," or house arrest at his grandmother's house.

Lakysha Fields attended the hearing. The court asked her to approach the bench and engaged her in the following discussion:

> THE COURT: Okay…I know you've been here through the whole proceeding, so you've been hearing what he did --
>
> MS. FIELDS: Yes.
>
> THE COURT: -- and my reaction to it, and one of the things I was really concerned about is that he kind of threw you under the bus. His behavior, you know, put you and him at risk, but you in particular. You put your neck out for him --
>
> MS. FIELDS: Yes.
>
> THE COURT: -- to the tune of $50,000, plus having him under your roof and agreeing to be his custodian. Do you wish to continue in this capacity? Do you think -- you know, if I put him back in your home on lockdown, I -- honestly, you know, people can be -- people are complicated. People we love are complicated.
>
> MS. FIELDS: Yes, they are.
>
> THE COURT: Right? So just because you love someone doesn't mean that they're a good risk.
>
> MS. FIELDS: You're right.
>
> THE COURT: So I want to have a chance to talk to you because I need to figure out what to do here. And given that he -- he violated your trust and now you're at risk, what are you thinking about all of this?
>
>     * * *

After making sure that Fields still understood her duties, and after obtaining her assurances that she would report Murphy if she knew he violated the conditions of his release, Fields recommitted to remaining on the bond as a co-signor and custodian:

> MS. FIELDS: I have no problem when I am there when Darrell's there. He do -- does apply [himself], whatever I tell him to do. Now, his actions that he did was the time when he was supposed to go to school or work. He know[s] I do not play that. I do not play that at all. I'm very strict. I don't care how old you are. I was raised like that. You still could get a slap on the hand or whatever the case may be, whatever it is. I believe he can do it. I know I can do it.
>
> THE COURT: Okay.
>
> MS. FIELDS: I know I can do it.

Transcript at 25-29.

On the strength of Fields's representations, the court did not remand Murphy but instead ordered him placed on lockdown at Fields's house.

On October 18, 2019, the government filed a motion to forfeit Murphy's bond and to remand him to custody. [Docket No. 162]. The government's papers include numerous uncontested exhibits that establish three significant violations of his conditions of release. To begin with, the record demonstrates that in the days leading up to and immediately following the August 15, 2019 hearing, Murphy was frantically communicating with a person he had hired to create fake school transcripts, explaining that he needed them quickly or else he would end up in jail. Even more concerning was the revelation that instead of going to school, Murphy had been spending his time brokering the sale of large amounts of marijuana, as set forth in detail in his Instagram account. Finally, Murphy's Instagram account also documents repeated contact with co-Defendants Deshawn Lemons-Woodard and Paul Rivera. These contacts did not end until nearly two weeks after the August bail violation hearing.

At the October 30, 2019 hearing on the government's motion, the court ordered that Murphy be remanded to custody. The court instructed the parties to file supplemental briefs on

6

the issue of bond forfeiture.

## B. Shawn Lemons-Woodard

Lemons-Woodard is 24 years old. On April 10, 2019, following a contested detention hearing, the court declined to follow Pretrial Services's recommendation of detention and released Lemons-Woodard on strict conditions that included a $75,000 unsecured bond with two co-signors (his mother Nichelle Lemons and his aunt Deshawna Sterling Patton).[2] Lemons-Woodard was ordered to live with Patton, who agreed to act as his custodian. The court also imposed an electronic monitoring condition and placed Lemons-Woodard on house arrest, with the ability to leave home for specified pre-approved reasons such as court appearances, drug treatment, and counseling. Lemons-Woodard was ordered to have no contact with his co-Defendants outside the presence of counsel. The court restricted his use of a phone unless permitted by his custodian and also ordered that Lemons-Woodard could not have access to the internet, given the government's proffer regarding his use of his Instagram account to market and sell firearms. Release Order [Docket No. 79]. The court interviewed Patton and Lemons in court, explained the obligations of co-signors and custodians, and made sure that they understood all risks, including the risk of a $75,000 forfeiture should Lemons-Woodard violate the conditions of his release. The court asked them if they understood the risks and obligations, and if they were willing to agree to sign on the bond and take on those risks. Patton and Lemons both answered in the affirmative.

As with Murphy, the first few months of pretrial supervision appeared to go well. On June 18, 2019, the court signed the parties' stipulation and proposed order allowing Lemons-Woodard to leave the home to begin looking for a job and to go to school. [Docket 121]. On September 9, 2019, the Pretrial Services officer circulated an informational memorandum explaining that Patton no longer wanted Lemons-Woodard to live with her and no longer wanted to serve as his custodian due to conflicts with Lemons-Woodard's girlfriend. After further investigation, the officer requested that the court hold a hearing to determine whether the conditions of release

---

[2] As with Murphy, the court appointed the co-signors under the section 3142(c)(xiv) "catch all" provision, and not as formal sureties.

should be modified in order to address the conflict.

At the October 1, 2019 hearing, the government notified the court and Lemons-Woodard that it was investigating potential bail violations committed by him. The court followed Pretrial Services's recommendation and modified the bond by removing Patton from her obligations on the bond as a co-signor and a custodian, by ordering Lemons-Woodard to live with Lemons, and by appointing Lemons as substitute custodian. Lemons agreed to act as a custodian and to continue to be a co-signor on the bond, even after learning that the government was developing information to demonstrate that Lemons-Woodard had violated his bail conditions. [Docket No. 159].

On October 18, 2019, the government filed its motion to remand Lemons-Woodard and to forfeit his bond. [Docket No. 162]. Prior to the hearing on that motion, the Pretrial Services officer circulated a bail violation notice stating that Lemons-Woodard had tested positive for marijuana use on four occasions in October 2019. The officer asked that those violations be addressed at the motion hearing. [Docket No. 172].

In its motion to remand, the government submitted uncontested evidence demonstrating that after Lemons-Woodard's release, which included the condition that he not use the internet, he created a new Instagram account. Lemons-Woodard then used that account to communicate with co-Defendants Rivera and Murphy. His communications included admissions that he had used drugs and was seeking Rivera's advice about how to clean the drugs out of his system in order to avoid detection through the drug testing condition of his release. Pursuant to his release conditions, Lemons-Woodard was on house arrest and could only leave his home for preapproved reasons, including employment. Lemons-Woodard apparently got a job in order to obtain opportunities to be out of the house. As he reported in an Instragram message to Rivera, "they got me on house arrest but I jus got a job so I be able to wiggle a lil." Lemons-Woodard's Instagram account demonstrates that he then used this "wiggle room" to sell marijuana while under pretrial supervision in July and August 2019. This included sales through Instagram, followed by personal delivery by Lemons-Woodard.

**II.     LEGAL STANDARDS**

8

Federal Rule of Criminal Procedure 46(f)(1) commands that the court "must declare the bail forfeited if a condition of the bond is breached." Although generally the purpose of a bail bond is to ensure that the accused will appear in court, forfeiture of a bond is not limited to situations where defendants fail to appear. Forfeiture is also appropriate for violations of other conditions of release. *United States v. Vaccaro*, 51 F.3d 189, 192-93 (9th Cir. 1995) (affirming bond forfeiture where defendant violated the "break no laws" condition of his release order).

Here, Murphy and Lemons-Woodard both clearly and knowingly breached conditions of their bonds. Murphy sold marijuana in violation of the law. He also likely violated the law by obtaining forged documents that he submitted to Pretrial Services as proof of compliance with a bond condition. He had impermissible contact with his co-Defendants. Finally, he lied to Pretrial Services about attending school and work, which resulted in him being out in the community for reasons that were not permitted under the conditions of his bond.

Lemons-Woodard breached the conditions of his bond by selling marijuana. He also had impermissible contact with two co-Defendants. He further violated his bond conditions by using the internet to create a new Instagram account and using it to sell drugs, seek advice about evading adverse drug testing results, and communicate with his co-Defendants. Therefore, the mandatory language of Rule 46(f)(1) requires the court to declare the bail forfeited as to both Murphy and Lemons-Woodard.

Even if bail is forfeited, Rule 46(f)(2) permits a court to set aside the forfeiture in whole or in part if surety surrenders the defendant into custody, or "it appears that justice does not require bail forfeiture." The decision whether to set aside or remit a forfeiture rests within the sound discretion of the court. *See United States v. Frias-Ramirez*, 670 F.2d 849, 852 (9th Cir. 1982); *United States v. Nguyen*, 279 F.3d 1112, 1115 (9th Cir. 2002).

The Ninth Circuit considers six non-exclusive factors in determining whether the court should exercise its discretion to set aside or remit the forfeiture of a bond:

> 1) the defendant's willfulness in breaching a release condition; 2) the sureties' participation in apprehending the defendant; 3) the cost, inconvenience, and prejudice suffered by the government; 4) mitigating factors; 5) whether the surety is a professional or a member of the family or a friend, and 6) the appropriateness

1 of the amount of the bond.

2 *United States v. Amwest Sur. Ins. Co.*, 54 F.3d 601, 603 (9th Cir. 1995) (citations omitted); *see also Nguyen*, 279 F.3d at 1115-16. Courts in this district have considered additional factors, including whether actions by the government unknown to the surety increased the risk that the defendant would violate the conditions of his release, and whether the surety played a role or was in some measure responsible for the conduct that breached the release conditions. *United States v. Little Cloud*, No. 16-cr-266-SI at 6, 7 (N.D. Cal. Nov. 9, 2017) (citing *United States v. Famiglietti*, 548 F. Supp. 2d 398, 405 (S.D. Tex. 2008) (Brazil, M.J.) (applying Ninth Circuit law); *United States v. Villalobos*, No. 00-cr-40242, 2005 WL 6127290, at *2 (N.D. Cal. Feb. 17, 2005) (Brazil, M.J.)). Neither of these additional factors applies to the bonds at issue here.

Not all of the factors need to be resolved in the government's favor in order deny a request to set aside or remit the bond. *Amwest*, 54 F.3d at 603. In weighing the factors, the court is guided by the primary purposes of the Bail Reform Act: ensuring the defendant's appearance in court and observance of the release conditions. *Vaccaro*, 51 F.3d at 192-93.

The third and fifth factors bear further explanation. With respect to the third factor, which examines the cost, inconvenience and prejudice suffered by the government, the government does not have to provide a bill of costs, "nor can the cost and inconvenience factor be dismissed simply because they were not substantial." *Nguyen*, 279 F.3d at 1117. The Ninth Circuit has "recognized that where there has been cost and inconvenience to the government . . . the amount need not be specified. That is consistent with this court's view that bail bonds are contracts for liquidated damages. . . . The hallmark of a liquidated damage provision is reasonableness at the time the agreement is made rather than a calculation of actual provable losses when the breach occurs . . . . A match [between cost to government and the bond] is not necessary and its lack does not require that the bond be remitted in whole or in part." *Amwest*, 54 F.3d at 604-05.

As to the fifth factor, it appears to draw a distinction between professional sureties on the one hand and family and friends on the other. However, the Ninth Circuit has declined to adopt a "loving relative" exception to bond forfeiture jurisprudence. "We believe that a loving relative . . . would be better advised to counsel her . . . relation to obey, rather than ignore, court orders."

United States District Court
Northern District of California

*Nguyen*, 279 F.3d at 1117 n.2. Judge Brazil examined this point extensively in *Famiglietti* and *Villalobos*. He noted that Ninth Circuit jurisprudence prevents the court from considering as a mitigating factor "the effect the forfeiture would have on the sureties-even if that effect would be devastating and the amount of money forfeited to the government clearly was much greater than the costs the government incurred because of the defendant's breach." *Famiglietti*, 548 F. Supp. 2d at 407. He wrote that the policy underlying this rule did not derive from a desire to punish the defendant or the surety, but rather to ensure "that defendants and sureties will take their bond commitments seriously." *Id.*

As Judge Brazil explained in detail, "persons accused of federal crimes often have substantial criminal records and few assets." *Id.* at 408. Professional sureties may be less likely to post bail for federal defendants who can trigger forfeiture of a bond through violation of any term of release.[3] For this reason, the willingness of family and friends who are willing to support a defendant's release by exposing themselves to adverse financial consequences is critical to a federal defendant's ability to argue successfully for release pending prosecution. *Id.* However, as Judge Brazil cogently described, this means that where defendants are released without the actual posting of a money bond, but rather on the potential risk of a money judgment, "bail commitments by family members and friends must be real" in order to have the desired effect of inducing a defendant to comply with his or her release conditions:

> Generally, a surety who believes that she will suffer substantially if the defendant breaches is more likely to exercise considered judgment about the reliability of the defendant than a surety who doesn't expect to suffer significantly if her assurances to the court are ill-placed. It would impair substantially the court's ability to assess how real the surety's apparent vote of confidence in the defendant was if the surety were permitted to assume that her promises were not likely to be enforced…
>
> [Moreover,] [a] judge who is trying to decide whether he can release a defendant needs to have some level of confidence that the defendant himself will feel pressure (from within, not just from without) to comply with the terms the court sets. One important source of such 'internal' pressure on a defendant is fear that if he breaches, he will impose real harm on people he cares about. That source of pressure would be diluted, if not extinguished, if the defendant were permitted to

---

[3] This is in contrast to state bail practices, where a surety may only be exposed to loss on a bond if the defendant does not appear in court.

United States District Court
Northern District of California

> infer that nothing bad (of any consequence) would happen to his sureties if he breached. Again, a judge who thought that a defendant held this view would be less able to develop the assurances the law requires in order to release a defendant before trial.

*Id.* at 408-09.

Judge Brazil reasoned that "if a judge could not have confidence that proposed sureties believe that their exposure on a bond is real, i.e., that they will in fact be required to pay the government the face value of the bond if the defendant commits a serious breach of the bond's terms," the judge would not be able to "ascribe real weight" to the proffered family members or friends. This in turn would likely lead to fewer pretrial release decisions, particularly for those defendants who do not have access to significant financial assets. *Id.* at 409. He concluded that "it is essential to protecting the rights of defendants that judges be able to attach real significance to commitments by sureties-and judges can do that only if they can assume that sureties really believe they will be required to pay the face value of the bond if the defendant commits a serious breach of its terms." *Id.*

### III. ANALYSIS

#### A. <u>Darrell Murphy</u>

Murphy first argues that the bond should be remitted because he has satisfied Rule 46(f)(2)(A), which gives the court discretion to set aside a bail forfeiture if "the surety later surrenders into custody the person released on the surety's appearance bond." Murphy argues that he qualifies for a set-aside under this provision because Fields accompanied him to the hearing on the motion for remand, which amounts to having "surrendered" Murphy into custody. This argument lacks merit. Rule 46(f)(2)(A) is directed to situations where a defendant fails to make a court appearance and a surety later surrenders the defendant into custody. Here, Murphy engaged in numerous bail violations that resulted in remand and bond forfeiture; however, those violations do not involve failures to appear in court. Therefore, Rule 46(f)(2)(A) does not apply.

Turning to the multi-factor analysis, Murphy concedes that the first factor favors the government in that he acted willfully. The record amply demonstrates that Murphy acted with a clear understanding that he was violating numerous conditions of his release. Murphy does not challenge the government's proffer that he sold large amounts of marijuana over the internet, and

12

that he communicated with co-Defendants Lemons-Woodard and Rivera outside the presence of counsel. Murphy also feigned going to work and school in order to evade his restrictive house-arrest conditions. After being caught in his deceptive behavior, he repeatedly lied to his Pretrial Services officer as well as the court and purchased forged documents in order to try to cover his tracks.

The second factor considers the surety's participation in apprehending the defendant. As discussed above with respect to Murphy's argument regarding Rule 46(f)(2)(A), this is not a situation involving Murphy's failure to appear. Therefore, this factor does not apply here.

The third factor examines the cost, inconvenience and prejudice to the government. The government argues that Pretrial Services spent many hours investigating Murphy's deceptive conduct and subsequent attempts to cover it up, instead of using that time to supervise other defendants on pretrial release. In addition, federal agents and prosecutors spent significant amounts of time preparing an affidavit to support a search warrant to obtain content from Murphy's Instagram account, and then reviewing thousands of pages of material that resulted in locating evidence of Murphy's drug sales while on supervision, prohibited contact with his co-Defendants, and procurement of forged school documents. The government also had to spend time on the motions for remand and forfeiture. All of this time could have been spent on the prosecution of the merits of this case, or on other cases. Murphy responds that the time spent by Pretrial Services, agents and prosecutors does not come close to the $50,000 bond amount. However, as discussed above, the Ninth Circuit specifically has stated that the government does not have to specify or otherwise prove up the costs caused by a defendant's bail violations. This is because the amounts set on release bonds function essentially as liquidated damages. Therefore, a match between cost and bond is not required, and the lack of a match does not necessarily result in whole or partial remission. *Amwest*, 54 F.3d at 604-05.

As to the fourth factor, the only mitigation identified by Murphy is his youth. This is not compelling. The court interacted with Murphy multiple times in court and is convinced that he completely understood the consequences of his actions, including the risk that the government would obtain a monetary judgment against him as well as his grandmother.

13

The fifth factor examines whether the surety is a professional, as opposed to a family member or friend. Fields submitted a letter to the court asking for remittance of the bond and explaining that Murphy had deceived and betrayed her as well, even though she had done what she could to help him. [Docket No. 183.] The court acknowledges that forfeiture of the bond may well result in difficult consequences for Fields and Murphy's financial status, whether or not the government ultimately chooses to attempt to collect on the bond. However, as set forth above, the Ninth Circuit specifically has declined to adopt a "loving relative" exception to bond forfeiture. Fields was well aware of the serious repercussions she could face as a co-signor on the bond. In fact, the court specifically addressed her at the August 15, 2019 bail violation hearing and gave her an opportunity to seek removal from her obligations. She chose to stay on the bond. As eloquently described by Judge Brazil, in order for a judge to accept a family member or friend with few material resources as a co-signor, the risks of signing the bond have to be "real." If defendants and co-signors agree to take on risks that they believe are illusory, co-signors will no longer effectively mitigate the risk of flight or danger posed by defendants. Such a system could lead to the unsought result of fewer pretrial release decisions for defendants who are not able to post property or money.

The sixth factor examines the appropriateness of the amount of the bond. Without citing to legal authority, Murphy argues that a $50,000 forfeiture would amount to an excessive and arbitrary penalty in violation of his due process rights under the Fifth Amendment. The court disagrees. As discussed above, the Ninth Circuit considers a release order to be a contract, with the bond amount akin to a liquidated damages clause, and the cost and inconvenience incurred by the government as a result of a defendant's breach of bond conditions need not be specified, nor does it need to match the amount of the bond. "The hallmark of a liquidated damage provision is reasonableness at the time the agreement is made rather than a calculation of actual provable losses when the breach occurs." *Amwest*, 54 F.3d at 604-605. A judge must set the amount of a bond based on "circumstance-specific and defendant-specific considerations." *Famiglietti*, 548 F. Supp. 2d at 414. In this case, the court adopted the $50,000 bond amount recommended by Pretrial Services after a full detention hearing because that amount plus the other bond conditions

fairly accounted for the specific risks presented by Murphy. Drawing upon ten years of service on the bench, the court also finds that $50,000 is well within the range of bond amounts set in similar situations.

In sum, all relevant factors weigh in favor of forfeiture of Murphy's bond.

**B. Shawn Lemons-Woodard**

With respect to the first factor, Lemons-Woodard concedes that he acted willfully. Lemons-Woodard did not attempt to dispute that he covertly created a new Instagram account in violation of his bond conditions and that he used that account to sell marijuana and to illicitly communicate with his co-Defendants, including asking for advice about how to evade incurring a positive drug test.

The second factor regarding the surety's participation in apprehending the defendant does not apply here.

With respect to the third factor, Lemons-Woodard does not attempt to dispute that Pretrial Services and federal agents and prosecutors had to devote time to investigating and proving up his bail violations. As set forth above, the government need not quantify the "cost, inconvenience and prejudice" that it incurred. Although the nature of Murphy's violations required more investigative and prosecutorial resources than those expended on Lemons-Woodard, those resources were nevertheless significant.

As to the fourth factor, the only mitigation identified by Lemons-Woodard is that by supporting him, his mother was acting out of love and did not participate in any way in the violations. This is true. However, as discussed with respect to the fifth factor, the Ninth Circuit has specifically refused to adopt a "loving relative" exception in its bail forfeiture jurisprudence.

Under the fifth factor, the court recognizes that co-signor Lemons is a family member rather than a professional surety. However, she voluntarily agreed to co-sign the $75,000 bond at its inception, after having been fully apprised of the attendant risks. As Lemons-Woodard acknowledges, at the October 1, 2019 hearing after another colloquy with the court, Lemons once again agreed to stay on the bond and to take on the additional role of custodian, even after being informed by the government that it was investigating Lemons-Woodard for bail violations. The

15

court recognizes with regret that imposition of bail forfeiture undoubtedly would damage Lemons's financial status, whether or not the government chooses to attempt to collect on the bond. However, the record demonstrates that she assumed that risk voluntarily and knowingly. For the same reasons discussed at length above, the risk of bail forfeiture must be "real" in order to maintain the systemic integrity that is critical to a judge's ability to mitigate risks through the use of unsecured bonds, and to be able to release defendants who do not have ready access to resources.

As to the sixth factor, Lemons-Woodard does not argue that the amount of the $75,000 bond was inappropriate. Instead, he argues that it is a sum that would create an extreme hardship for his mother; as discussed above, this is no doubt true, but does not affect the analysis. The court set the unsecured $75,000 bond amount by taking into account the specific risks presented by Lemons-Woodard; it is well within the range of bond amounts set for defendants posing similar risks.

In sum, all relevant factors weigh in favor of forfeiture of Lemons-Woodard's bond.

### IV. CONCLUSION

For the reasons set forth above, the court orders that Murphy and Lemons-Woodard's bonds be forfeited against each of them as well as their co-signors. The court finds that the facts for each of these Defendants do not support the exercise of discretion to remit the bond in whole or in part. Pursuant to Rule 59(a), a party may serve and file objections to this order within 14 days after being served with a copy of this order. Failure to object in accordance with Rule 59(a) waives a party's right to review.

**IT IS SO ORDERED.**

Dated: February 17, 2020

_____
Donna M. Ryu
United States Magistrate Judge